THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRELL POOLE, Defendant-Appellant.

First District (6th Division)   No. 1—89—3253

Opinion filed December 2, 1991.

Michael J. Pelletier and Martin Carlson, both of State Appellate Defender's Office, of Chicago (Prentice H. Marshall, Jr., and Marjorie M. Golis, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Defendant Tyrell Poole was convicted of attempted armed robbery after he tried to rob a neighbor at knifepoint. An off-duty sheriff's deputy heard the neighbor's screams and shot defendant twice as he attempted to flee. Defendant was sentenced to 10 years in prison.

On appeal, defendant alleges four errors by the trial court: (1) the court erred as a matter of law by denying defendant's motion to suppress his confession despite the State's failure to produce a material witness at defendant's suppression hearing; (2) the court erred in determining defendant's confession was voluntary based on the evidence; (3) the court abused its discretion by precluding defendant from discussing in his opening statement racial slurs made by the alleged victim; and (4) the court erred as a matter of law in denying defendant's motion for a new trial because the jury's verdict was contrary to the manifest weight of the evidence.

Testimony at trial revealed that defendant approached the victim, Simone Byvotes, as she was about to enter the front door of her home, and attempted to rob her at knifepoint on May 20, 1988. The robbery was foiled when an off-duty sheriff's deputy, who was a neighbor of Byvotes, heard her screams and came to her aid, shooting the defendant in the left buttock and lower left leg as he fled.

Defendant was arrested at the scene and indicted June 20, 1988, in a three-count indictment charging him with armed robbery, aggravated battery and unlawful use of a firearm by a felon. Defendant pled not guilty to all counts. The aggravated battery and unlawful use of a firearm by a felon charges were dismissed by the court before trial.

On February 16, 1989, defendant moved to suppress any statements made by him at the time of his arrest, at or about 11:45 p.m. on May 20, 1988, or later. He alleged that any statements, including an alleged voluntary statement he signed at 2:18 a.m. on May 21, were the product of coercion brought on by his intense pain and Officer Michael Auld's promise that if he signed the statement Auld would help obtain some pain medication for him. The trial court heard testimony from the defendant, from the paramedic on the scene who allegedly witnessed defendant's oral statement on which the written

statement was based, and from a Dolton police sergeant who had defendant sign a *Miranda* waiver.

At the suppression hearing, defendant testified that he never made a statement in the ambulance and was never given *Miranda* warnings. He testified that he asked Auld what he was being charged with and Auld told him attempted rape. Defendant testified that once he was in the hospital, while in a room with Auld, he asked Auld for pain medication because "my leg was killing me." Defendant testified that Auld told him "if I signed this statement, the paperwork and stuff, and got that out of the way, he would make sure that I got some medication." He testified that Auld assured him he would get pain medication and so he signed the statement at about 2:18 a.m. without reading it. He testified that Auld never read the statement out loud to him and that no one ever read out loud a *Miranda* waiver form.

On cross-examination, defendant testified that the paramedic kept giving him smelling salts to wake him up while he was being transported to the hospital. He testified that he asked for pain medication while in the ambulance but that the paramedic told him that he would get some at the hospital. Defendant testified that he asked several hospital personnel for medication but no one would give him any. Defendant testified that at one point while he was in a hospital room, Auld left the room and then returned a moment later and told him "he'd be able to get my pain medication for my leg and stuff as soon as I signed these statements." He then indicated that "these statements" included the confession and a *Miranda* waiver.

Paramedic Doepp, also a Palos Park police officer, testified that defendant was conscious and "his level of response seemed to be orientated to person, place and time" at the scene. He testified that he never heard Officer Auld say anything to defendant that he would consider coercive and he never heard Auld promise defendant any type of medication in exchange for a statement.

Doepp testified that "standard operating procedure" prevents him from delivering medication to a gunshot victim. Doepp testified that he heard Auld give defendant his *Miranda* warning and that defendant said he understood his rights. Doepp testified that Auld asked defendant if he wanted to make a statement and defendant agreed and then did so. Doepp testified that defendant made the statement to Auld before they arrived at the hospital at 12:36 a.m. Though Doepp had no independent recollection of defendant's oral statement, he viewed defendant's written statement and then testified that it ac-

curately depicted the oral statement he heard defendant make to Auld.

On cross-examination, Doepp testified that he remembered defendant making a statement and Auld taking notes but he did not remember whether Auld read the *Miranda* rights to defendant or spoke them from memory. He testified that defendant was in pain and asked for pain medication. Doepp said he did not recall defendant telling him he was weak and felt faint. Doepp testified that he had no recall of giving defendant smelling salts. Doepp explained that you do not give medication for pain relief to an individual with a recent gunshot wound because of the need to monitor vital signs.

Doepp testified on redirect examination that defendant was conscious, his pupils were responsive, his skin color and temperature were normal. Doepp testified that the defendant told him "he was going to kick my ass when he got better." He testified that the defendant also told him he had not tried to rape the victim. Doepp denied withholding medication on his own or at Auld's direction to induce defendant to make a statement. On re-cross-examination, Doepp admitted that he never saw the defendant sign a statement.

Sergeant William Wragg testified that he arrived at the hospital at 2 a.m. and gave defendant a constitutional rights form which defendant read and then signed. Wragg testified that the defendant made no statement to him that would indicate medication was being withheld by anyone or that he was being coerced. Wragg testified that he instructed Auld to put the time and date on the statement. He testified that he was not present when defendant signed the statement or when Auld allegedly read back the written statement to defendant. He conceded that to the best of his knowledge, the *Miranda* waiver was signed after defendant made his oral statement to Auld in the ambulance.

The trial court then denied defendant's motion to suppress the written statement. The court found that the oral statement defendant gave in the ambulance came after *Miranda* warnings were issued and that defendant later signed the *Miranda* form and the statement at the hospital. He found no evidence of coercive government action in the ambulance and said none could have taken place in the hospital.

The trial judge stated: "The contention is that a promise is made at two eighteen a.m. for pain medication. Let's ask ourselves; could the government coerce a hospital? Where is the misconduct? There is no suggestion to this Court in the motion that the defendant before this bar is other than normal, capable, logical, reasonably educated. So where is the intrusive government misconduct? This court finds

none. Police departments have no control over the dispensation of medication in the hospital. To suggest that a policeman could tell a doctor or a nurse to withhold medication in a hospital setting, that's ludicrous."

The court also stated: "There is no question that the young man is well educated. He had been informed about the nature of his injuries, he knew he was in a hospital setting. It's clear to me from the facts as presented there is no action at all by the police which in any way overbore this gentleman's mind, and I find that the statement was signed by him voluntarily."

As to whether Auld's testimony was material, he stated: "What about the material witness rule? Certainly we heard from the ambulance driver. Very material to the giving, the giving of the statement. The recordation of the statement? Wragg touched on that. What about the presence of the officer? The State offers a reasonable explanation. The officer is not now here. He's in the State of Washington, and employed as a full-time officer. To me that's reason enough to explain his absence in the totality of all these circumstances."

On October 23, 1989, just before his trial, defendant motioned the court seeking an order *in limine* to prevent introduction of the confession, which he alleged was based on coercion. Defendant contended that the trial court erred when it did not compel Auld to appear and testify as to the foundation of the written statement under the material witness rule. The motion was denied.

The State moved *in limine* that the defense, in both its opening statement and closing argument, be prevented from "bringing up any issues of race involving the defendant and the victim and witnesses." The trial judge granted the State's motion, saying: "I don't think the opening statement is an appropriate place for us to interject race, or ethnic, or any other kind of considerations. Particularly, when I've been harping at the jurors that these factors are not relevant. *** Now what my ruling will be as the evidence unravels relative to closing arguments may be a matter of a different color. *** Whatever anyone said and did you may interrogate to your heart content. *** You may cross examine on anything that affects credibility without waiving the racial flag."

At trial, Simone Byvotes testified that after she parked her car in her driveway she heard a noise and saw defendant run toward her. She screamed and they began to struggle. She testified that defendant held a knife to her face, cutting her lip and choking her. She testified that he ordered her to open her front door but that she yelled "don't stab me," pretended to faint and then did faint. She testified

that defendant then pulled a $1 bill from her front pocket, tossed it in the air and asked her "where her money was." She admitted that she did not turn the $1 bill over to police and that defendant did not take her billfold from her pocket. She acknowledged that she did not seek medical attention and that no cut on her lip appeared in photos taken of her at the police station after the incident. She denied ever calling the defendant any names and testified that she only addressed him as "sir."

Marvin Isaacson, another neighbor and off-duty sheriff's deputy, testified that he heard screaming, grabbed two handguns and ran outside to witness defendant standing over Byvotes. He testified that he announced he was a police officer, ordered defendant to drop the knife and that defendant told him he would cut her and then cut him next. He testified that defendant "lunged" toward him from approximately 30 feet away and then began to run. He testified he fired six shots at defendant, of which two hit defendant, and then he made defendant crawl back to Byvotes' patio to wait for the police to arrive.

Former Dolton police officer Auld testified that he was assigned to guard defendant after defendant's arrest at the scene. Defendant was placed in an ambulance, and Auld stayed in the ambulance with him. Auld testified that he read defendant his *Miranda* rights and that he then had a conversation with defendant and told defendant he was going to put his statement into writing. The officer testified that the defendant told him he understood and agreed to Auld's action. Auld testified that later at the hospital, defendant signed the written statement after reading it himself and having it read to him.

The statement said, in pertinent part, "I was trying to rob her in front of her (victim's) doorstep." Suspect: "I want your money." Victim: "I don't have any money." Suspect: "I then forced her to the ground with my steak knife. She (victim) started to yell out, so I told her I'm going to cut you if you don't stop. I needed some money to get me to Michigan, Benton Harbor—Anette Ballard, 949 W. Street. I seen her (victim) pull up at her home so I ran up there."

On cross-examination, Auld testified that Poole's hands were handcuffed behind his back the entire time he was being attended to by the ambulance driver. He admitted that defendant complained of pain. He admitted that he never interrogated defendant while other officers were present or asked any of the officers on the scene to witness the interrogation or his giving of the *Miranda* warnings. Auld testified he had no recollection of defendant almost passing out or being given smelling salts. Auld testified that defendant complained of

pain the entire time he was being treated, while he was in the emergency room and while he was waiting to have X rays taken.

Auld admitted that he did not have a *Miranda* waiver form with him and therefore defendant could not sign such a form until another officer, Sergeant Wragg, brought the form to the hospital. Auld testified that he could not recall whether Wragg read the *Miranda* warnings to defendant before giving defendant the form to sign. Auld testified that no one witnessed defendant signing the confession and no one witnessed Auld reading the confession aloud to defendant first. On redirect examination, he testified that defendant never told Auld he was in too much pain to talk. Auld was never asked whether he promised defendant pain medication in exchange for his written statement.

The State rested and defendant's motion for a directed verdict was denied. The defense called the defendant as its first witness. Defendant testified that as he was walking past Byvotes' home, she pulled her car into the driveway and nearly struck him. He testified that he was upset and yelled at her and she responded that he should "watch where his black ass was going" and told defendant to "get off her property" before she did something to him. Defendant testified that Byvotes reached into her pocket and that he, having previously been beaten by white youths in the neighborhood, pulled out a steak knife for protection. He testified that he was still five to seven feet away from Byvotes when he turned toward a flash of light and saw a man pointing a gun at him. He testified that he dropped the knife and ran and that is when he was shot. He testified that the shooter never identified himself.

The jury found defendant guilty of attempted armed robbery and not guilty of armed robbery. He was sentenced to 10 years in prison.

Defendant filed a motion for a new trial on November 21, 1989, alleging that the State failed to prove him guilty beyond all reasonable doubt, the verdict was against the manifest weight of the evidence, the defendant was denied due process of law because his alleged confession was not suppressed, defendant was wrongfully denied the ability to mention race in his opening statement, the defendant was denied equal protection, the court erred in denying defendant's motion for a directed verdict, the court erred by omitting jury instructions requested by defendant, and the State made prejudicial statements in its closing argument.

Defendant's motion for a new trial was denied, and defendant filed his appeal.

Initially we consider the defendant's contention that (1) the court erred as a matter of law by denying defendant's motion to suppress his confession despite the State's failure to produce a material witness at defendant's suppression hearing, and (2) the court erred in determining defendant's confession was voluntary based on the weight of the evidence.

State statute provides that the State has the burden of proving that a confession was voluntary. (Ill. Rev. Stat. 1989, ch. 38, par. 114—11(d).) The State must prove under a totality of the circumstances whether the defendant's will was overborne at the time he made the statement. (*People v. Veal* (1986), 149 Ill. App. 3d 619, 623, 500 N.E.2d 1014.) A confession is admissible if its voluntariness is proven by a preponderance of the evidence. (*Veal*, 149 Ill. App. 3d at 623.) The court need not be convinced beyond a reasonable doubt. (*Sims*, 21 Ill. 2d at 433, 173 N.E.2d at 498.) On review, the decision of the trial court will not be disturbed unless manifestly against the weight of the evidence or unless the reviewing court finds that the trial court has clearly abused its discretion. *Sims*, 21 Ill. 2d at 433, 173 N.E.2d at 498.

Defendant contends that the trial court improperly decided that Auld was not a material witness. A confession objected to as involuntary should not be admitted unless each material witness on the issue is either produced or his absence is explained. *People v. Sims* (1961), 21 Ill. 2d 425, 428, 173 N.E.2d 494, 495.

Defendant argues that his testimony indicated he never made a statement in the ambulance or at the hospital and that he only signed the inculpating statement while he was handcuffed to a hospital bed at 2:18 a.m., in pain and after he had been promised pain medication by Auld if he would sign the statement. Defendant argues that, therefore, the failure to produce Auld for the suppression hearing was a violation of the material witness rule as discussed in *Sims*.

Defendant relies on *People v. Peck* (1974), 18 Ill. App. 3d 112, 309 N.E.2d 346, to support his argument. In *Peck*, the appellate court found the trial court erred in not suppressing an alleged confession where at the hearing on the motion to suppress defendant testified that police induced him into giving a statement by threatening him and by promising him immunity. The State presented no evidence at the hearing to rebut the defendant's testimony although two officers interrogated defendant and obtained a written statement from him.

In its ruling, the court noted that defendant's testimony was uncontroverted. The *Peck* court stated: "It was improper for the trial court to disregard defendant's uncontroverted testimony. *** [T]he

prosecution did not sustain its burden of proof at the hearing on the issue of voluntariness. The prosecution argues that the error, if any, was harmless. We are not prepared to so find." *Peck*, 18 Ill. App. 3d at 116.

■ We note, however, that defendant's testimony here was not uncontroverted. Doepp testified that defendant made a voluntary statement in the ambulance.

Defendant argues the trial court should have required Auld's presence at the suppression hearing because the State failed to adequately explain his absence.

Defendant cites *People v. Lumpp* (1983), 113 Ill. App. 3d 694, 700, 447 N.E.2d 963, 968, to support this argument. In *Lumpp*, the reviewing court found that the explanation that an officer was no longer with the department and resided outside Chicago "standing alone, did not excuse the failure to produce" the officer.

This case is factually distinguishable from *Lumpp*. Here the trial judge found Auld's absence explained. Auld worked as a police officer in the State of Washington at the time of the suppression hearing. He was no longer a member of the Dolton police force and no longer under the department's control. Although the court in *Lumpp* found such an explanation insufficient "standing alone," the record here and comments by counsel at oral argument establish that the State offered to fly Auld in for the suppression hearing if he could be brought in one time for both the suppression hearing and the trial once a trial date was set. The defendant, however, asked that the suppression hearing and ruling take place in advance of the trial date. Based on this scenario, and the testimony of Doepp at the suppression hearing as to the conversation between defendant and Auld in the ambulance, we find the trial court did not err when it found Auld's absence was adequately explained.

Defendant argues that even if Auld was not a material witness, the court erred in determining defendant's confession was voluntary based on the testimony at the suppression hearing. Defendant based this argument on his testimony at the suppression hearing and the fact that Auld did not testify. Defendant notes that in his testimony he denied making any statement in the ambulance.

The State argues that Auld's trial testimony and Doepp's suppression hearing testimony established that defendant was given his *Miranda* warnings and then confessed freely and voluntarily. The State argues that no government misconduct took place and that Auld's testimony at trial provided evidence that defendant confessed freely and voluntarily. Because a trial judge's pretrial suppression or-

der is not a final order, a reviewing court can consider trial testimony when determining whether a motion to suppress was properly denied. *People v. Dale* (1989), 189 Ill. App. 3d 704, 545 N.E.2d 521.

The State contends that it has established by a preponderance of the evidence that defendant's statement was voluntary. The State contends that the evidence and testimony established: Doepp never heard Auld promise defendant medication, Auld advised defendant of his rights, Auld told defendant he would put the conversation in writing and defendant agreed, Auld testified he read the statement to defendant and Doepp and Auld contradicted defendant's testimony that he never made a statement in the ambulance.

■ Our review of the testimony at the suppression hearing establishes no abuse by the trial court. Doepp testified that defendant could not be given pain medication because of his wounds. Defendant himself testified that he asked a number of medical personnel for pain medication but they refused him. At trial, Auld was never asked directly by either the prosecutor or by defense counsel whether he offered defendant pain medication in exchange for a signature on the written statement. Auld did testify, however, that defendant signed the statement freely and voluntarily.

We find incredible defendant's contention that Auld somehow could have prevented hospital personnel from giving him pain medication. The paramedic, Doepp, testified that he did not give defendant—and would not give any gunshot victim—pain medication as a matter of procedure.

The evidence presented by the State at the suppression hearing included Doepp's testimony that he heard defendant make a statement to Auld. Defendant testified at that hearing that he made no such statement. The trial court is required to determine the credibility of the witnesses. Here the trial judge found that under the standard of the totality of the circumstances, the evidence established that defendant gave his statement freely and voluntarily. We find no abuse in the trial court's ruling and therefore uphold its decision not to suppress defendant's written statement.

Next, defendant contends that the trial court abused its discretion by precluding him from discussing in his opening statement racial slurs made by the alleged victim which Poole intended to introduce as evidence in his defense.

Defendant contends the trial court erred in granting the State's motion *in limine* because it prevented defendant from "bringing up any issues of race involving the defendant and the victim and witnesses."

Defendant argues that it was his defense that he pulled out a knife because he feared a racially motivated attack. He contends that the racial slurs, which he testified Byvotes made to him, were evidence of his motivation in threatening her. In addition, defendant notes that the State was permitted in its opening statement to tell the jurors Byvotes' version of the event.

Defendant cites in support of his position *People v. Hampton* (1979), 78 Ill. App. 3d 238, 397 N.E.2d 117, and *People v. Williams* (1978), 60 Ill. App. 3d 529, 532, 377 N.E.2d 367.

The court in *Hampton* stated that an opening statement should contain an outline of facts which a party in good faith intends to prove. While its scope and latitude are largely within the discretion of the court, the accused has the right to have his attorney present in opening statement the facts which he intends to prove, without unreasonable restrictions. *Hampton*, 78 Ill. App. 3d at 243, 397 N.E.2d at 121.

In *Williams*, defendant was arrested and charged with resisting or obstructing a police officer. Before trial, the trial court entered an order barring defense counsel from discussing 17 particular topics of conversation, one of which was any allegation of racial discrimination. The reviewing court reversed the trial court, finding that the exclusionary order with regard to defendant's opening statement prohibited defendant from presenting any meaningful defense and constituted an abuse of discretion. The reviewing court summarized the trial court order this way: "The exclusionary order entered in the instant case was overbroad. Even a cursory reading of the order reveals that it would prohibit any meaningful opening statement by the defendant, any showing of a witness' bias, or any challenge to a witness' credibility. The order would impermissibly exclude evidence, if any, concerning the arresting officer's preexisting racial prejudice or prejudice directed toward the defendant. It is so broad that it defies precise delineation of its scope." *Williams*, 60 Ill. App. 3d at 533.

The State contends that the limitations placed on Poole by the trial court did not hamper defendant's efforts to present his case. The State notes that defendant was permitted to question the victim about the racial makeup of her community and whether she ever called defendant any names. Defendant was permitted to testify about the racial comments he alleges Byvotes made to him and his fear that prompted him to pull out his knife for protection.

The State argues that the trial court's ruling was particularly appropriate in that the defense counsel stated at the time that he did not know whether defendant would testify. The State argues that

even if the trial judge erred in preventing defendant from making certain comments in his opening statement, the error was harmless because defendant was able to present his defense during trial and in closing arguments.

Before ruling, the trial judge stated: "[O]pening statement is [not] an appropriate place for us to interject race, or ethnic, or any other kind of considerations. I don't think the opening statement is an appropriate place for us to interject race, or ethnic, or any other kind of considerations. Particularly, when I've been harping at the jurors that these factors are not relevant."

The trial judge granted the State's motion *in limine* with regard to defendant's opening statement and stated that he would rule on trial testimony involving race as individual questions were asked. The trial transcript indicates that defendant made no specific reference to race in closing arguments.

■ A reviewing court will not reverse a trial court's ruling on a motion *in limine* unless it finds the trial court abused its discretion. (*Williams*, 60 Ill. App. 3d at 532.) We find no abuse of discretion. We find that the defendant was given adequate opportunity to present his theory of the case even though restricted in opening argument. Defense counsel questioned Byvotes about whether she called defendant any names and defendant testified to alleged racial slurs he contends prompted the incident. The record indicates that defendant was barred from asking Byvotes directly whether she told defendant to "watch where his black ass was going" and to "get off her property" before she did something to him. However, the court did not order defense counsel to avoid the subject altogether. Defendant does not point to an order by the court that would have prevented him from presenting this theory in his closing argument. We note that the closing argument makes no reference to racial slurs.

Finally, we consider defendant's contention that the trial court erred as a matter of law in denying defendant's motion for a new trial because he contends the jury's verdict was contrary to the manifest weight of the evidence. Defendant cites the improper standard for the jury. The State must prove defendant guilty beyond a reasonable doubt.

On appeal, the reviewing court must view the evidence in the light most favorable to the prosecution and can only overturn the conviction if it finds that no rational trier of fact could find from the evidence that the State has proven the essential elements of the crime beyond a reasonable doubt. *People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 453, 461.

A person commits robbery when he takes property from the person or presence of another by the use of force or by threatening the imminent use of force. (Ill. Rev. Stat. 1989, ch. 38, par. 18—1.) A person commits armed robbery when he or she violates section 18—1 while he or she carries on or about his person, or is otherwise armed with a dangerous weapon. (Ill. Rev. Stat. 1979, ch. 38, par. 18—2.) A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense. Ill. Rev. Stat. 1989, ch. 38, par. 8—4.

In support of his argument that he was not found guilty beyond a reasonable doubt, defendant points to the following items of evidence and testimony: though he exposed a steak knife he was carrying for protection he remained 6 to 10 feet away from Byvotes and denied he ever choked or cut her, he denied taking anything from her, his alleged confession was involuntary and should not have been admitted, Byvotes could not point to any "objective evidence that Poole ever made contact with her," photos taken after the incident failed to reveal any cuts or bruises on Byvotes, Byvotes never sought medical attention, Byvotes' testimony was incredible because she failed to alert police that defendant had allegedly taken $1 out of her pocket, and Byvotes' neighbor, Isaacson, testified that he did not see defendant make any contact with Byvotes and therefore could not confirm whether or not defendant cut her or choked her and Isaacson did not see defendant take anything from Byvotes.

■ The State contends that the jury's verdict was supported by the evidence. The State offers the following testimony and evidence to support its argument: Byvotes' credible testimony that defendant grabbed her by the neck, threatened her, asked her for money, took a dollar out of her pocket, asked her "all you have is one dollar," and held a knife to her throat, Isaacson's testimony that defendant was standing over Byvotes with a knife at her throat, police recovered a knife near Byvotes' garage, and defendant's confession that he demanded money and threatened to cut the victim.

The State argues that it need not prove defendant actually obtained money or hurt the victim to establish an attempted armed robbery. Ill. Rev. Stat. 1989, ch. 38, par. 18—2; *People v. Mulcahey* (1978), 72 Ill. 2d 282, 286, 381 N.E.2d 254.

We conclude that the evidence when viewed in the light most favorable to the prosecution clearly supported the jury's verdict. We do not accept defendant's argument that the jury's finding of defendant's guilt was so contrary to the evidence that its verdict should be reversed. We do not accept his argument that no rational trier of fact

could have found defendant guilty beyond a reasonable doubt based on this evidence. We therefore find the trial court did not commit reversible error in denying defendant's motion for a new trial.

For all the foregoing reasons, defendant's conviction for attempted armed robbery is affirmed.

Affirmed.

RAKOWSKI, P.J., and McNAMARA, J., concur.